**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

———————————————————  :
                                           :
ROMEO S.K.,                                :
                                           :          Civil Action No. 20-5512 (JMV)
                       Petitioner,         :
                                           :
          v.                               :               **OPINION**
                                           :
JOHN TSOUKARIS, et al.,                    :
                                           :
                       Respondents.        :
———————————————————:

**VAZQUEZ, District Judge:**

Petitioner Romeo S.K.[1] filed a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, D.E. 1., followed by a Motion for Temporary Restraining Order ("TRO"), D.E. 3. For the reasons detailed below, the Court denies the Motion for TRO.

### I.      Background

Petitioner is an immigration detainee being held by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") at the Essex County Correctional Facility ("ECCF") in Newark, New Jersey.  The instant action was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both personnel and detainees at ECCF.   D.E. 16-5 at 13.

---

1 Petitioner is identified herein only by his first name and the first initials of his surnames in order to address certain privacy concerns associated with § 2241 immigration cases.  This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

2 COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020.  *See* Centers for Disease Control and Prevention *Coronavirus*

Petitioner is thirty-five years old and has been detained since August 1, 2019.   D.E. 1-2 at ¶¶ 1, 3.   Petitioner, who is a legal permanent resident of the United States, is subject to mandatory detention under 8 U.S.C. § 1231(a).   D.E. 16 at 22.   On August 1, 2019, Petitioner was served with a "Notice to Appear" charging him with being convicted of two crimes involving moral turpitude not arising out of a single scheme or criminal misconduct pursuant to Section 237(a)(2)(A)(ii) of the Immigration and Nationality Act ("INA").   D.E. 16-8 at 3.   Petitioner's criminal history includes convictions for access device fraud or conspiracy in 2019, resisting arrest in August 2018, aggravated assault on a law enforcement officer and credit card theft in 2017, and possession of a forged instrument in 2017.   D.E. 16-11 at 45.

On October 21, 2019, an Immigration Judge ("IJ") convened a hearing and heard testimony from Petitioner in support of his application for cancellation of removal for lawful permanent residents under Section 240(a)(A) of the INA.   D.E. 16-11 at 7-8.   The IJ denied the application for cancellation of removal, noting, *inter alia*, inconsistencies in Petitioner's testimony surrounding his recent tax filings with the Internal Revenue Service ("IRS").   *Id.* at 8-9.   The IJ further noted that, among other things, Petitioner lied about his identity and his citizenship status to ICE personnel.   *Id.* at 10.   During the hearing, Petitioner was also cross-examined about information related to his making untruthful statements about his marital status and criminal history in his naturalization interview.   *Id.*   On April 3, 2020, the BIA dismissed his appeal of the

---

*Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

IJ's decision.   D.E. 16-11 at 4-6.   Petitioner filed an appeal of the BIA's decision in the United

States Court of Appeals for the Third Circuit on May 7, 2020.

　　　After Petitioner filed his habeas petitioner and his motion for a TRO, the Court convened

a May 11, 2020 telephonic hearing.   D.E. 18.

## A.  COVID-19

　　　The COVID-19 pandemic is at the heart of this case.   Judge John E. Jones III, in a

thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has
> rampaged across the globe, altering the landscape of everyday
> American life in ways previously unimaginable. Large portions of
> our economy have come to a standstill. Children have been forced
> to attend school remotely. Workers deemed 'non-essential' to our
> national infrastructure have been told to stay home. Indeed, we now
> live our lives by terms we had never heard of a month ago—we are
> "social distancing" and "flattening the curve" to combat a global
> pandemic that has, as of the date of this writing, infected 719,700
> people worldwide and killed more than 33,673. Each day these
> statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, --- F. Supp. 3d ---, 2020 WL 1671563, *2 (M.D. Pa.

Mar. 31, 2020) (footnotes omitted).   Judge Jones accurately pointed to the swift growth of cases.

Since his opinion dated March 31, 2020, the number of worldwide cases and deaths has risen from

719,700 and 33,673 to 4,307,287and 295, 101.[3]

　　　New Jersey has been particularly hard hit, with the northern part of the state bearing the

initial brunt.   As of May 18, 2020, New Jersey had 148,039 cases and 10,435 deaths.   *COVID-*

*19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited May 18,

---

[3] *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION,
https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited May 15, 2020).

2020).   The total number of cases and deaths for Bergen County, Essex County, and Hudson County, respectively, were 17,459/1,460; 16,600/1,546; and 17,574/1,068.   *Id.*   New Jersey has taken numerous steps, such as the Governor's initial stay-at-home order issued on March 21, 2020, to combat the virus and the recent decision to extend the public health emergency declaration for an additional thirty days.[4]   In addition, New Jersey has closed schools, beaches, state parks, and county parks.[5]   Recently, there has been a lessening of certain restrictions, such as those related to parks and beaches.

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people."   *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL        AND        PREVENTION,        https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited May 14, 2020).   The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[6]   COVID-19 is "spread mainly from person-to-person."   *Id.*   This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks.   *Id.*   The virus can also be spread by infected persons who are not showing symptoms.   *Id.*

---

4 *Murphy extends N.J. coronavirus public-health emergency for 30 days. State of emergency remains in effect*.   N.J.com, https://www.nj.com/coronavirus/2020/05/murphy-extends-nj-coronavirus-public-health-emergency-for-30-days-state-of-emergency-remains-in-effect.html (last visited May 12, 2020).

5 *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

6 *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces      (last visited April 8, 2020)

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease or those who are immunocompromised.[7]  Besides death, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and can require extensive use of a ventilator.  Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]"  D.E. 1 at ¶ 29 (citation omitted).  In addition, complications from the virus can manifest rapidly.  *Id.* (citation omitted).  There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments.  *Id.* at ¶ 30.  To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene.  *Id.* (citation omitted).

## B. Petitioner's Condition

Petitioner submits that the conditions at ECCF coupled with his diabetes mellitus and hypertension expose him to suffering severe complications or even death should he contract COVID-19.  D.E. 3-1 at 17.  He further submits that ECCF detainees are housed in close proximity with one another and that they do not have "practical access to cleaning or sanitization supplies."  *Id.* at 20.  Petitioner submits that detainees must purchase soap from the commissary and that he has not received additional supply of soap since the two bars he obtained in April.  D.E. 1 at ¶ 42.  At oral argument, Petitioner submitted through counsel, that his detention prevents him from engaging in employing healthy lifestyle choices such as exercise and consuming a more

---

7 *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

nutritious diet to control his medical conditions.

Petitioner's medical records reflect that he has received ongoing care from ECCF medical personnel since his detention commenced in August of 2019. D.E. 20. The records further reflect that as early as October of 2019, Petitioner became non-compliant with the medical provider's treatment and medication plan. *Id.* at 49. On October 3, 2019, Petitioner was reported to have been non-compliant with medication that was prescribed for his abdominal pain. *Id.* On October 21, 2019, Petitioner refused the medical diagnosis and treatment after he was informed that his lab results revealed that he was diabetic. *Id.* at 54. On October 25, 2019; October 28, 2019; and October 31, 2019, Petitioner was reported as having refused to take diabetes-related medication. *Id.* at 60-64, 73. Petitioner reported that he could not comply with medication and blood sugar monitoring on Mondays and Thursdays due to religious prohibitions.[8] *Id.* at 49-50, 95. Also on April 1, 2, 6, 10, 11, 15, 17, 20, 21, 25, 27, and May 5, 2020, Petitioner was reported as being non-compliant with blood sugar monitoring and/or taking prescribed medication. *Id.* at 95. The Court notes that Petitioner's stated basis for refusal on multiple instances throughout April of 2020, was that the Ramadan fasting period had begun. *Id.* at 175.

On April 29, 2020, Petitioner's COVID-19 antibody screening result came back negative.

### C. ECCF Conditions

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. ICE Guidance on COVID-19, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on April 8, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160

---

8 Petitioner submits that blood sugar monitoring constitutes breaking a fast under the rules of his religion. D.E. 23-1 at ¶ 6.

individuals who were over the age of 60 or pregnant.   *Id.*   ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance.   *Id.*   Further, ICE provided a list of health conditions that detention facilities should consider in favor of release.   D.E. 16-3 at 2-3.

Respondents submitted declarations from Alfaro Ortiz, the warden at ECCF, which detail the efforts of ECCF to prevent and manage the virus.   D.E. 16-5, 19-1.   As of the date of Ortiz's most-recent declaration dated May 11, 2020, he confirmed the following number of COVID-19 cases.   D.E. 19-1.   Three ICE detainees have tested positive for COVID-19, were treated at University Hospital, cleared for discharge, and are now in isolation at ECCF.   *Id.* at ¶ 44. Additionally, five county inmates tested positive[9]; and eighty-four members of the correctional staff, sixty-three of which have been cleared to resume work at the facility.   *Id.*   All staff members who were in proximity of those who tested positive, were sent home to self-quarantine for a fourteen-day period or sent to the hospital for testing.   *Id.*

In his declaration, Warden Ortiz details the efforts of ECCF to deal with the virus.   A major component has been keeping the population below capacity in order to ensure adequate space to practice social distancing.   He reports that, among other things, ECCF is currently at approximately 68 percent of its maximum capacity, and the ICE detention areas that are normally configured to house 60 detainees per pod, are now reduced to a maximum of 48 detainees.   D.E. 19-1 at ¶¶ 4-5.   Moreover, the pods allow for all detainees to sit at least six feet apart.   *Id.* at ¶ 6. Inmates recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing.   *Id.* at ¶ 20.

---

9 County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed.   D.E. 16-5 at ¶ 31.

Social visits were suspended on March 22, 2020, and attorney visits can now be arranged in a dedicated room within the visitor's lobby wired to support video conferencing between the detainee and his attorney.  *Id.* at ¶ 20.

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several RNs, LPNs, nurse practitioners and physician assistants.  *Id.* at ¶ 12.   There is always a nurse practitioner in the facility, and a physician at the facility sixteen hours a day.  *Id.* at 13.   A physician is on call on a 24-hour basis for emergency needs.  (*Id.*)   The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19, by housing them separately. *Id.* at ¶ 33.   ECCF requires that all detainees and inmates undergo medical screening including temperature readings before admission in the facility.  *Id.* at ¶ 11.

If a detainee complains of COVID-19 symptoms, he is immediately evaluated and if that person exhibits COVID-19 symptoms, he or she is provided a surgical mask.  *Id.* at ¶ 22. Moderate to severely symptomatic detainees are immediately taken to University Hospital for medical evaluation or COVID-19 testing.  D.E. 19-1 at ¶ 30.   Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results.  *Id.*   Asymptomatic detainees who have had a known exposure to COVID-19, are "co-horted" with other similarly situated detainees, for fourteen days.  *Id.* at ¶ 33.

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19."  *Id.* at ¶ 19.   As of May 1, 2020, ECCF has a supply of almost 200,000 bars of soap.  *Id.* at ¶ 25.   Detainees have unlimited access to free bars of soap although

they are not provided hand sanitizer.  *Id.* at ¶¶ 24, 31.   Additional cleaning staff have been hired in order to increase the frequency of cleaning each day.  *Id.* at ¶ 19.   ECCF was designed with air handlers and a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours.  *Id.* at ¶ 17.

In mid-March 2020, ECCF contracted with a lab to acquire COVID-19 testing kits.  *Id.* at ¶ 20.  On March 26, 2020, ECCF received 1008 Tyvek suits, 1,200 N95 masks, and 29,900 surgical masks.  *Id.* at ¶¶ 16, 33.

## II.    LEGAL STANDARD

Petitioner submits that the conditions of his confinement violate his Fifth Amendment due process rights.  D.E. 1 at ¶¶ 87-93, 3-1 at 20-23.   The standard for granting a temporary restraining order is the same as that for a preliminary injunction.   Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.   Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest.  *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy.  *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and … when extraordinary or exceptional circumstances exist which make the grant of bail necessary to

make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

### III.   DISCUSSION

The Court finds that Petitioner has not established a reasonable likelihood of success on the merits.   Before delving into the relevant analysis in this case, the Court notes the following. The Court is well-aware of the seriousness of the COVID-19 pandemic, and the Court likewise recognizes that county jails and detention facilities were not designed with pandemics in mind. During the pandemic, the Court has received requests for habeas relief from civil immigration detainees that fall into three general categories:   (1) detainees who do not fall into a particularly vulnerable category; (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and (3) detainees who have tested positive for COVID-19.   As to the first category, the Court has denied relief without prejudice.   *See Ousman D. v. Decker*, Civil Action No. 20-2292, 2020 WL 1847704 (D.N.J. Apr. 13, 2020).   At the same time, the Court recognizes that merely because a person does not fall into a vulnerable category does not mean that he or she will not experience severe symptoms if he or she contracts the virus. The Court has denied those petitions without prejudice because information concerning COVID-19 is subject to change, and as additional information becomes available, the Court could reach a different conclusion as to those detainees who currently are not considered unusually vulnerable. As to the second category, the Court has ordered release provided that the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release.   *See Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020).   As to the third category – detainees who have the virus – the Court has found that the analysis changes.   *See Sergio S.E. v. Rodriguez*, Civil Action No. 20-3982, 2020 WL 2111029

(D.N.J. May 4, 2020); *Derron B. v. Tsoukaris*, Civil Action No. 20-3679, 2020 WL 2079300 (D.N.J. Apr. 30, 2020).   Before a detainee contracts the virus, the public has an interest in preventing further positive cases.   In addition to the health and welfare of the detainee, the public also has an interest in seeing that scarce medical resources are conserved.   Yet, once a detainee tests positive, the public also has an interest in not introducing additional cases into the general public.   Once a detainee tests positive, in the Court's view, the critical question is whether the detainee is receiving constitutionally adequate care.   As a result, once a detainee tests positive, the Court does not order release but instead remains available on short notice to address any issues that may arise as to adequacy of medical care.   To this end, the Court has inquired of facilities as to whether detainees can seek medical attention twenty-four hours a day (in case symptoms worsen) and, if necessary, how long it will take to transport a detainee to a hospital or medical center.

    A.  Fifth Amendment Conditions of Confinement Claim

    Petitioner is a civil detainee as opposed to a criminal prisoner who has been convicted and sentenced, therefore his conditions of confinement claim will be analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment.   *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).   Civil immigration detainees are entitled to the same due process protections as pretrial detainees when the conditions of confinement fall below constitutional minimums. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

    The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally

inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).   As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose.   *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment" in other words, there is "an expressed intent to punish on the part of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]."   *Bell*, 441 U.S. at 538 (internal citation omitted).   The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution."   *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic.   In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment.   *Id.* at *2.   Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective.   *Id.*

The district judge in *Thakker v. Doll*, Civ. Docket No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion.   Judge John E. Jones III

noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees.[10]   *Id.*

   The Court agrees with the *Thakker* court that COVID-19 alters the analysis.   And the Court also recognizes that jails are not designed with pandemics in mind.   However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis.   *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6. The Court also agrees that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.   At the same time, a petitioner's individual characteristics (including criminal history) are also important considerations.

   Petitioner argues that the conditions serve no legitimate purpose. D.E. 3-1 at 21.   He submits that he lives with two health conditions that have been objectively identified as placing him in a higher risk of suffering severe side effects of COVID-19.   He adds that notwithstanding his refusal to submit to blood sugar monitoring or diabetes medication due to religious purposes,

---

10 Since the TRO was granted in *Thakker*, Judge Jones has denied preliminary injunctive relief to several detainees, citing the facility's ongoing improvements in its response to COVID-19. *Thakker v. Jones*, Civ. Action No. 1:20-480, ---F. Supp.---3d, 2020 WL 2025384 at *11 (M.D. Pa. Apr. 27, 2020).

he also lives with hypertension, which is an independent and adequate basis for this Court to order his release considering the pandemic.   D.E. 23 at 2-3.

Respondents state that Petitioner has not raised a valid constitutional claim.   They argue that Petitioner is lawfully detained pursuant to 8 U.S.C 1231(a) and is still within the ninety-day post-removal order mandatory period of detention.   D.E. 16 at 22-23.   They further argue that Petitioner has not shown how his confinement is excessive to the purpose of detention or how the conditions amount to punishment.   *Id.* at 24-26.

The Court does not dispute the seriousness of medical conditions such as diabetes or hypertension, however the record here reflects that ECCF has been attentive to Petitioner's needs since his detention began.   *See Saquib K. v. Tsoukaris*, Civ. Action No., 20-3489, 2020 WL 2111028 at *5 (D.N.J. May 4, 2020) (denying deliberate indifference claim by a detainee living with high blood pressure, citing the facility's monitoring and control of his condition).   The Court respects Petitioner's religious beliefs but makes two observations.   First, assuming that proper diabetic treatment was objectionable on religious grounds during Ramadan, the record reveals Petitioner's recalcitrance at times outside that holy period.   Second, if Petitioner is going to refuse appropriate medical treatment on religious grounds, then the refusal is equally applicable whether Petitioner is detained or not.

Moreover, the Court is convinced that Petitioner's detention serves a legitimate governmental interest.   Unlike other matters in which the Court has ordered a detainee's release, the Court does not conclude that there are adequate conditions of release that will satisfy the government's legitimate interests.   Petitioner's criminal history, which involves recent convictions for separate incidents, coupled with his history of dishonesty with immigration officials and ICE officers, tip the balance in favor of the government.   The Court appreciates

14

Petitioner's argument that he has young American citizen children, strong ties to the Philadelphia-area, and that he was only sentenced to non-custodial sentences for each conviction. Notwithstanding these factors, based on his record, the current conditions at ECCF are not excessive in light of the government's legitimate purpose. *See Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134-35 (3rd Cir. 2017) (holding that the government has a legitimate interest "in reducing the flight risk posed by prisoners facing removal."). Petitioner is now under a final order of removal. The Court finds that the government has a legitimate interest in ensuring the public's safety during the duration of his immigration proceedings. Petitioner's history, which includes assaulting a law enforcement officer and concealing his identity to ICE officers, does not instill sufficient confidence in his future compliance with immigration officials or court orders.

Under the totality of the circumstances, the Court does not find that Petitioner is likely to succeed on his claims.[11]   Petitioner's claims are thus denied.

---

11 Petitioner also raises a "deliberate indifference" claim in his petition and motion for TRO. D.E. 1 at ¶¶ 82-83, 3-1 at 23-27. Because the current pandemic represents unchartered territory in recent jurisprudence, the parties are understandably drawing from analogous situations. One of those situations is cruel and unusual punishment under the Eighth Amendment, which applies a deliberate indifference standard to medical treatment (or lack thereof). *See*, e.g., *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. Of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

However, the Court finds that the Eighth Amendment is not applicable because Petitioners are not convicted criminal inmates but civil immigration detainees. As noted, the Court evaluates the Petitioners' claims under the Due Process Clause of the Fifth Amendment, which prohibits "punishment" of a civil detainee. *See Natale*, 318 F.3d at 581; *see also Hubbard v. Taylor*, 399 F.3d 150, 157-60 (3d Cir. 2005). As a result, the Court finds that the deliberate indifference standard merely sets the floor, rather than the ceiling, of constitutionally required medical care in this matter.

## IV.     Motion to Seal

Also pending before the Court is Respondents' Motion to Seal Petitioner's medical records. D.E. 22.   A motion to seal is governed by Local Civil Rule 5.3, which provides in relevant part that a request to seal must be presented by motion.   "The motion papers must describe "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available." L. Civ. R. 5.3(c)(2)."   *Harris v. Nielsen*, Civil Action No. 09-2982, 2010 WL 2521434 at *2-3 (D.N.J. June 15, 2010).   Respondents filed a declaration from Assistant United States Attorney Kristin L. Vassallo in support of their Motion to Seal, which they submit Petitioner consented to. D.E. 22-2.   In light of the parties' mutual consent, the Court will grant the Motion to Seal.

## V.     Conclusion

The Court denies the Motion for TRO.   D.E. 1, 3.   The Court grants Petitioner's Motion to Seal his medical records.   D.E. 22.   An appropriate Order accompanies this Opinion.

Dated: 5/18/2020

_____
JOHN MICHAEL VAZQUEZ
United States District Judge

16