**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                :
ROMEO S.K.,                             :
                                                :         Civil Action No. 20-5512 (JMV)
               Petitioner,              :
                                                :
       v.                               :              **OPINION**
                                                :
JOHN TSOUKARIS, et al.,                 :
                                                :
               Respondents.             :
_____:

**VAZQUEZ, District Judge:**

This matter originated with Petitioner Romeo S.K.'s,[1] ("Petitioner") motion to amend his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.   D.E. 30-1.   Also pending before the Court is Petitioner's second motion for a temporary restraining order ("TRO") and motion to seal.   D.E. 32, 47.   Petitioner alleges a violation of substantive due process and a violation of procedural due process under the Fifth Amendment   For the reasons set forth below, the Court grants the Motion to Amend, the Motion to Seal, denies the habeas Petition, and denies the Motion for TRO.

---

[1] Petitioners are identified herein only by their first name and the first initials of their surnames in order to address certain privacy concerns associated with § 2241 immigration cases.   This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

## I.        BACKGROUND

On May 18, 2020, the Court issued an opinion and order denying Petitioner's request for a TRO.   D.E. 26-27.   On June 10, 2020, Petitioner filed a motion for leave to file an amended petition, as well as a second motion for TRO.   D.E. 30-1, 32.   Petitioner asks the Court, *inter alia*, to issue the writ of habeas corpus ordering his immediate release on the ground that his continued detention violates the Due Process clause or alternatively issue injunctive relief ordering his immediate release or order Respondents provide him with a bond hearing in United States Immigration Court.   D.E. 30-3 at 46.   Petitioner also requests reasonable costs and attorney fees pursuant to the Equal Access to Justice Act "EAJA."

On July 8, 2020, the Court convened a telephonic hearing with the parties to hear arguments.   D.E. 45.

The Court expressly incorporates its prior opinion, D.E. 26, here.   The incorporation includes not only the factual background but also the legal and analysis sections.   In this Opinion, the Court refers to new facts and arguments raised by the parties.

Petitioner now submits the measures taken by ECCF such as COVID-19 antibody screening and increased social distancing, are not sufficient to counter the spread of the virus. D.E. 32-1 at 15-18.   Petitioner has appended an unsigned declaration, where he submits ECCF is not providing soap to its inmates; is not implementing inadequate sanitation procedures on commonly used items such as the gym equipment, telephones and microwaves; and is not providing adequate medical care which has consequently taken a toll on his mental state as he fears infection and the possible effects.   D.E. 30-6.   Petitioner also provides an affidavit from Rosa Santana of First Friends, an organization which supports immigration detainees, and multiple

affidavits from an attorney representing other detainees at ECCF, which describe the conditions at ECCF in March and early April.   D.E. 30-12, 30-13, 30-28.

Petitioner further submits that his condition is worsening as demonstrated by a fall in the shower, which he submits is indicative of improper management of his diabetes.   D.E. 32-1 at 21. Petitioner's most up-to-date medical records document that he reported a fall to the medical staff on both April 16, 2020 and April 19, 2020.   D.E. 31 at 159, 164.

Along with his revised Petition, Petitioner appended a declaration from Dr. Eve Bloomgarden, M.D., an endocrinologist based in Chicago, Illinois, who reviewed Petitioner's medical records but who has not seen or treated Petitioner.   D.E. 30-23.   Dr. Bloomgarden opines that Petitioner is at high risk of serious medical complications including death if he contracts COVID-19.   *Id.* at ¶¶ 11, 22.   More specifically, she opines, the absence of adequate trust and communication between Petitioner and the ECCF medical staff has contributed to his reluctance to comply with the diabetes treatment protocol and to the inadequate level of medical care he is receiving.   *Id.* at ¶¶ 13-15.   Dr. Bloomgarden also indicates that Petitioner's reported vision problem on June 2, 2020, is indicative of diabetic retinopathy, which can result in blindness if left untreated.   *Id.* at 16.   The Court notes Dr. Bloomgarden's declaration was executed on June 1, 2020, although she opines about an event which did not purportedly occur until June 2, 2020.   *Id.* at 7.

Respondents submitted an updated declaration from Alfaro Ortiz, the warden at ECCF, which details the efforts of ECCF to prevent and manage the virus.   D.E. 36-5.   As of the date of Ortiz's most-recent declaration, he confirmed the following number of COVID-19 cases.   There were no new positive test results for the three weeks prior to the declaration.   *Id.* at ¶ 44.   Eight ICE detainees were previously reported to have been confirmed as positive cases in Ortiz's prior

declaration.  D.E. 19-1.  Neither are there any new positive test results among the county inmate population for the two weeks prior to Ortiz's latest declaration.  D.E. 36-5 at ¶ 44.  Additionally, only one county inmate who tested positive remains at ECCF, [2] and of the ninety-one members of the correctional staff who tested positive, eighty-three have been cleared to resume work at the facility.  *Id.*  All staff members who were in proximity of those who tested positive, were sent home to self-quarantine for a fourteen-day period or sent to the hospital for testing.  *Id.*

In his declaration, Warden Ortiz details the efforts of ECCF to deal with the virus.  A major component has been keeping the population well below capacity in order to ensure adequate space to practice social distancing.  He reports that, among other things, ECCF is currently at approximately 68 percent of its maximum capacity, and that the ICE detention areas that are normally configured to house 60 detainees per pod are now reduced to a maximum of 48 detainees.  D.E. 36-5 at ¶¶ 4-5.  Moreover, the pods allow for all detainees to sit at least six feet apart.  *Id.* at ¶ 6.  Inmates and detainees' recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing.  *Id.* at ¶ 20.  Social visits were suspended on March 22, 2020, and attorney visits can now be arranged in a dedicated room within the visitor's lobby wired to support video conferencing between the detainee and his attorney.  *Id.* at ¶ 20.

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several RNs, LPNs, nurse practitioners and physician assistants.  *Id.* at ¶ 12.  There is always a nurse practitioner in the facility twenty-four hours a day, and a physician at the facility sixteen hours a day.  *Id.* at ¶ 13.  A physician is

---

[2] County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed.   D.E. 36-5 at ¶ 44.

on call on a 24-hour basis for emergency needs.   (*Id.*)   The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19, by housing them separately.   *Id.* at ¶ 19.   ECCF requires that all detainees and inmates undergo medical screening including temperature readings before admission in the facility.   *Id.* at ¶ 11.

If a detainee complains of COVID-19 symptoms, he is immediately evaluated and if that person exhibits COVID-19 symptoms, he or she is provided a mask.   D.E. 36-5 at ¶ 22.   Moderate to severely symptomatic detainees are immediately taken to University Hospital for medical evaluation or COVID-19 testing.   D.E. 36 -5 at ¶ 30.   Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results.   *Id.*   Asymptomatic detainees who have had a known exposure to COVID-19, are "co-horted" with other similarly situated detainees, for fourteen days.   *Id.* at ¶ 33.

ECCF is testing its population using rapid testing antibody screening.   *Id.* at ¶ 45.   The antibody screening differs from COVID-19 diagnostic screening as it is performed through a blood test to minimize risk to healthcare providers.   *Id.*

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19."   *Id.* at ¶ 19.   ECCF has an eleven-month supply of soap.   *Id.* at ¶ 37.   Detainees have unlimited access to free bars of soap although it is not antibacterial soap. *Id.* at ¶ 36.   Ortiz expressly refutes any allegations from detainees of insufficient access to soap and disinfectant.   *Id.*   Additional cleaning staff have been hired in order to increase the frequency of cleaning each day.   *Id.* at ¶ 19.   ECCF was designed with air handlers and a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours.

*Id.* at ¶ 17.

## II.   FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM (COUNT I)

### A.  Subject Matter Jurisdiction

Before conducting the injunctive relief analysis, the Court must determine whether Section 2241 permits Petitioner to seek the relief requested here.   Respondents submit that the Court lacks jurisdiction to decide the matter pursuant to Section 2241.   D.E. 36 at 22-28.

This Court, and several other district judges, have previously determined that Section 2241 is the appropriate vehicle for the injunctive relief sought.   *See*, *e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020).   At the time, Respondents did not argue against this analysis, instead asserting that petitioners lacked standing.   Respondents, however, have now challenged the Court's jurisdiction under Section 2241.[3]   For the reasons that

_____

3 In a thorough opinion, Judge Bumb recently determined that Section 2241 does not permit federal inmate habeas petitioners to challenge their conditions of confinement.   *Wragg v. Ortiz*, Civ. --- F. Supp. 3d ---, No. 20-5496, 2020 WL 2745247 (D.N.J. May 27, 2020).   Judge Bumb addressed a putative class action filed by federal prisoners, rather than a civil immigration detainee like Petitioner.   In her opinion, Judge Bumb noted that respondents distinguished federal inmates from civil immigration detainees vis-à-vis a Section 2241 analysis.   Judge Bumb observed the following:

> Respondents concede, as they must, that some district courts have found habeas jurisdiction based on civil immigration detainees' risk of contracting COVID-19 in detention facilities. Not only are those cases not controlling, Respondents point out, but they are not persuasive *because civil immigration detainees do not have the same statutory or regulatory avenues for relief as prisoners who can seek home confinement through the CARES Act or make a compassionate-release request to the BOP and a motion to the sentencing court seeking compassionate relief under 18 U.S.C. § 3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of prisoners because they fall under the Fifth Amendment, which provides them "more considerate treatment than convicted*

6

follow, the Court acknowledges that it is not clear whether Petitioner can maintain his action under Section 2241, as a civil rights action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971),[4] or both.   However, it is equally clear to the Court that Petitioner will, at a minimum, be able to proceed under either Section 2241 or *Bivens*.

As to the Court's authority to grant release on a writ of habeas corpus, the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) appears to acknowledge such authority. *Lucas* concerned a state prisoner's petition pursuant to 28 U.S.C. § 2254 rather than a civil immigration detainee matter.   *Id.* at 365-66.   The court in *Lucas* determined that the "extraordinary circumstances" standard controlled in determining whether "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."   *Id.* at 367.   As an example of such circumstances, the *Lucas* court pointed to *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), in which the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill.   *Id.* at 366-67.   Yet, the court in *Lucas* court continued, it was not suggesting that a petitioner's poor health would be the only situation that would meet the extraordinary circumstances standard.   *Id.* at 367.[5]

─────────────────────

prisoners." (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

*Wragg*, 2020 WL 2745247 *16 (emphasis added).

[4] "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations."   *Bistrian v. Levi*, 912 F. 3d 79, 88 (3d Cir. 2018).

[5] Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only

Respondents, however, point to a different line of Third Circuit cases that limit the reach of Section 2241, albeit in the federal inmate context.   In *Woodall v. Fed. Bureau of Prisons*, 432 F. 3d 235 (3d Cir. 2005), the petitioner challenged Bureau of Prisons ("BOP") regulations.   The sentencing judge had recommended to the BOP that the petitioner serve the last six months of his sentence in a halfway house (a type of "Community Correction Center" or "CCC"), but the regulations prohibited such an early release.   *Id.* at 237-388, 240.   Ultimately, the Third Circuit found the regulations improper in light of the relevant statutes.   *Id.* at 244-50.

However, before reaching the substantive question, the *Woodall* court addressed whether the petitioner's claim was cognizable under Section 2241.   *Id.* at 241.   The court analyzed the two habeas statutes available to federal prisoners:   Section 2241 and 28 U.S.C. § 2255; the former addressed "execution" of a sentence while the latter concerned the validity of a conviction or sentence.   *Id.*   (citing *Coady v. Vaughn*, 251 F. 3d 480, 485 (3d Cir. 2001).[6]   The Circuit acknowledged that the "precise meaning of 'execution of a sentence' is hazy."   *Id.* at 242.   Yet, after analyzing cases from other circuits, the *Woodall* court settled on the plain meaning of execution, that is "to 'put into effect' or 'carry out.'"   *Id.* at 242-43 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 794 (1993)).   The Third Circuit then concluded that

---

grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

[6] The respondent in *Woodall* argued that conditions of confinement fell outside the reach of habeas, citing to, among other decisions, *Nelson v. Campbell*, 541 U.S. 637 (2004).   *Id.* at 242 n.3.   The *Woodall* court disagreed, finding that *Nelson* addressed the reach of 42 U.S.C. § 1983 before it invaded habeas jurisdiction.   *Id.* (citing *Nelson*, 541 U.S. at 639).   But, the court in *Woodall* continued, *Nelson* did not rule that habeas relief was unavailable even if the remedy was also permissible under Section 1983.   *Id.*

the matter involved an execution of the petitioner's sentence, and was therefore properly brought under Section 2241, because a transfer from a prison to a CCC represented "more than a simple transfer" or a "garden variety prison transfer." *Id.* at 243. *See also Ganim v. Fed. Bureau of Prisons*, 235 F. App'x 882 (3d Cir. 2007) (finding that Section 2241 did not apply because the Petitioner challenged a decision "relating to a simple or garden variety transfer" when the BOP refused to transfer the petitioner to another facility so that he could be closer to his family).

In another case, *McGee v. Martinez*, 627 F. 3d 933, 934 (3d Cir. 2010), the Section 2241 petition concerned the Inmate Financial Responsibility Plan ("IFRP"), 28 C.F.R. §§ 545.10, 545.11. The Third Circuit framed the issue as whether the petitioner could maintain the case under Section 2241 "or whether he must re-file it as a civil rights action under Bivens[.]" *Id.* The court in *McGee* observed that when a petitioner challenges a condition of confinement, and a favorable outcome would not alter his conviction or sentence, a civil rights action under *Bivens* or 42 U.S.C. § 1983 is appropriate. *Id.* at 936 (citing *Leamer v. Fauver*, 288 F. 3d 532, 542 (3d Cir. 2002)). The Third Circuit then indicated that the IFRP is designed to encourage an inmate to meet his financial obligations imposed at sentencing. *Id.* at 936. As a result, the Circuit continued, the IFRP is a means to execute a sentence. *Id.* The *McGee* court concluded that because the petitioner's case involved the execution of his sentence, it was properly brought under Section 2241. *Id.* at 936-37.

The Circuit reached the opposite conclusion in *Cardona v. Bledsoe*, 681 F.3d 533 (3d Cir. 2012). In that case, the petitioner filed a Section 2241 action challenging the BOP's decision to place him in the Special Management Unit ("SMU"). *Id.* at 534. Like *McGee*, the *Cardona* court once again framed the issue as whether the matter was properly brought under Section 2241 or whether the petitioner "must instead file a civil rights action under *Bivens*[.]" *Id.* at 534; 537 n.9

("We have held that a challenge to the conditions of an inmate's confinement may be brought in a civil rights action." (citing *McGee*, 627 F. 3d at 936)). The court in *Cardona* decided that the petitioner's action was not appropriate under Section 2241. *Id.* at 538. The Third Circuit reasoned that the petitioner had not alleged that the BOP's action was inconsistent with a recommendation or command in the sentencing judgment. *Id.* at 537. The Circuit then turned to the petitioner's claim that placing him in the SMU could lead to a loss of his good time credits, which could impact the length of his confinement. *Id.* at 537. The *Cardona* court rejected this argument because even if the petitioner won, it did not "necessarily imply" that he would serve a shorter sentence. *Id.* (citing *Leamer*, 288 F. 3d at 543).

The foregoing cases certainly seem to indicate – at least as to federal inmates – that an action which is not viable under Section 2241 can nevertheless be brought as a *Bivens* action. However, after these decisions, the United States Supreme Court in *Ziglar v. Abassi*, 137 S. Ct. 1843 (2017), addressed matters falling under *Bivens* and its progeny. *Abassi* involved a suit by "six men of Arab or South Asian descent[,]" five of whom were Muslims, who were taken into custody as illegal aliens following the September 11, 2001, terrorist attacks. *Id.* at 1852, 1853. While detained, the men were allegedly subjected to harsh conditions of confinement along with both physical and verbal abuse. *Id.* at 1853. The detainees brought four claims under *Bivens*. *Id.* The Supreme Court found that the *Bivens* claims challenged conditions of confinement and fell into two general categories: "detention policy claims" and claims concerning the warden's permitting guards to abuse detainees. *Id.* at 1858-59.

The Supreme Court traced the history of *Bivens*-type actions, starting with the seminal case in which the Court permitted a damages remedy for persons injured by an unreasonable search and seizure. *Id.* at 1854 (citing *Bivens*, 403 U.S. at 397). The *Abassi* Court noted that *Bivens* claims

had only been extended to two areas:   gender discrimination by a Congressman in violation of the

Fifth Amendment Due Process Clause and failure to provide medical treatment to a prisoner in

contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause.   *Id.* at 1854-

55 (citing *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980)).

However, the Court also pointed out that it had not extended *Bivens* to a number of other areas,

including military matters and private prisons.   *Id.* at 1857 (citations omitted).   The *Abassi* Court

attributed this change in *Bivens* jurisprudence not only to the facts of particular cases but also to a

shift in the Supreme Court's analysis of such matters.   *Id.* at 1855.   As the Supreme Court

recognized, it had adopted a cautious approach in extending *Bivens* to other constitutional

violations such that a *Bivens* remedy was now "disfavored."   *Id.* at 1855-57.   As a result, the

Court in *Abassi* continued, it would not extend *Bivens* remedies "if there are 'special factors

counseling hesitation in the absence of affirmative action by Congress.'"   *Id.* at 1857 (emphasis

added) (quoting *Carlson*, 446 U.S. at 18).

 As to special factors, the *Abassi* Court ruled that "the inquiry must concentrate on whether

the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the

costs and benefits of allowing a damages action to proceed."   *Id.* at 1857-58.   The Supreme Court

added that certain matters – such as the military, the public purse, and federal land – in which

Congress has "designed its regulatory authority in a guarded way" would counsel against an

extension of *Bivens*.   *Id.* at 1858.   Other times, the Court continued, a particular "feature of a

case" may caution against permitting a new *Bivens* action.   *Id.*   The *Abassi* Court added that "if

there is an alternative remedial structure present in a certain case, that alone may limit the power

of the Judiciary to infer a new *Bivens* cause of action."   *Id.*

Turning to the claims before it, the Supreme Court first addressed the detention policy claims. *Id.* at 1858. The Supreme Court determined that the allegations constituted a new [7] *Bivens* claim and were therefore subject to the special factors analysis. *Id.* at 1860. The Court described the detention policy claims as a challenge to the "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created" after the September 11 attacks. *Id.* The Court in *Abassi* ruled that a *Bivens* claim was an improper manner to challenge an entity's policy. *Id.* (citation omitted). Relatedly, the Court continued, discovery and litigation would veer into discussions and deliberations in formulating the policy. *Id.* at 1860-61. The *Abassi* Court continued that the detention policy claims would also require "an inquiry into sensitive issues of national security[,]" which weighed against a *Bivens* money damages claim. *Id.* at 1861. The Supreme Court further noted that Congress' inaction in the 16 years since the September 11 attacks also countenanced against finding a new cause of action. *Id.* at 1862.

---

[7] The *Abbasi* Court also addressed a threshold issue, that is, whether the asserted *Bivens* claim was an already recognized cause of action or an attempt to create a new *Bivens* action. To that end, the Court indicated the following:

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60.

12

The *Abassi* Court then observed that the detainees may have other avenues to pursue relief:

> [W]e have left open the question whether [the detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526, n. 6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal").
>
> Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later.

*Id.* at 1862-63 (emphasis and second alteration added). As a result, the Court stated that the detainees had other forms of judicial relief available which meant that a *Bivens* damages remedy was usually not. *Id.* at 1863 (citations omitted).

The Supreme Court concluded that it therefore would not extend *Bivens* to the detention policy claims. *Id.* As to the second category – the warden permitting officers to abuse detainees – the Court acknowledged that it may be a viable new *Bivens* claim but remanded the matter for a special factors analysis in the first instance. *Id.* at 1863-65.

Critically, the Court in *Abassi* limited its ruling to cases in which petitioners sought money damages. *See*, *e.g.*, *id.* at 1854 ("The Court . . . would enforce a damages remedy[.]"), 1857 ("The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" (citation omitted)); 1858 ("[T]he decision to recognize a damages remedy requires an assessment of . . . . [I]f there are sound reasons to think that Congress might doubt the efficacy

13

or necessity of a damages remedy . . . ."); 1861 ("Allowing a damages suit in this context . . . . These considerations also counsel against allowing a damages claim to proceed . . . .   Were the inquiry to be allowed in a private suit for damages . . . .")   The Supreme Court clearly delineated an action for injunctive relief as opposed to one for damages.   *See*, *e.g.*, *id.* at 1858 ("It is true that if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations."); 1861 ("These concerns are even more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief.").   To this end, even when rejecting the application of *Bivens* to detention policy claims, the *Abbasi* Court ruled that "[t]o address those kinds of decisions, detainees may seek injunctive relief."   *Id.* at 1862.

In light of the foregoing, the Court concludes that Petitioner may maintain this action under both Section 2241 and a *Bivens* claim for injunctive relief.[8]   *See Woodall*, 432 F. 3d at 242 n. 3. Alternately, the Court concludes that the Third Circuit will permit the action to proceed as either a Section 2241 matter or a *Bivens* claim for injunctive relief.   Moreover, whether the Court reviews Petitioner's claims under Section 2241 or *Bivens*, the Court must conduct the same substantive analysis, that is, whether Petitioner has shown that he is entitled to injunctive relief due to a violation of the Fifth Amendment's Due Process Clause.[9]

---

[8] The Court realizes that when seeking injunctive relief for an ongoing constitutional violation, *Bivens* may not be the technical nomenclature as *Bivens* actions can be interpreted to mean only matters seeking money damages.   Thus, to the extent necessary, the Court's decision encompasses actions seeking injunctive relief for ongoing constitutional violations whether the matter is technically categorized as a *Bivens* matter or not.

[9] The United State Court of Appeals for the Third Circuit recently heard oral arguments in *Hope v. Warden Pike Cnty. Corr. et. al.*, 20-1784, 956 F.3d 156 (3d Cir. 2020), which may provide further guidance once a decision is reached.

At the outset, the Court acknowledges that if Petitioner was a federal inmate, Third Circuit precedent would preclude an action under Section 2241.  Petitioner is not challenging the "execution of his sentence"; in fact, Petitioner has not been sentenced at all because he is a civil immigration detainee.  The Third Circuit has not ruled that Section 2241 is unavailable in this context.  And the Court finds persuasive the reasoning of respondents in *Wragg*, which Judge Bumb adopted:

> [B]ecause civil immigration detainees do not have the same statutory or regulatory avenues for relief as prisoners who can seek home confinement through the CARES Act or make a compassionate-release request to the BOP and a motion to the sentencing court seeking compassionate relief under 18 U.S.C. § 3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of prisoners because they fall under the Fifth Amendment, which provides them "more considerate treatment than convicted prisoners." (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

*Wragg*, 2020 WL 2745247 *16 (emphasis added).

This reasoning is consistent with the Supreme Court's "necessity" of "use" observation as to habeas relief in *Abassi*.  *Abassi*, 137 S. Ct. at 1863.  The Court recognizes that the *Abassi* Court did not definitively hold that habeas relief was available to immigration detainees.  But at the same time, the Supreme Court also ruled that the detainees did have other forms of relief available to them, *id.*, which strongly suggests that the Supreme Court would find a habeas action cognizable, at least where necessity required it to do so.  Not only has this Court found Section 2241 to be applicable in civil immigration matters, so have numerous other district judges.  *See*

*Jaime F. v. Barr*, Civ. No. 19-20706, 2020 WL 2316437 *2 (D.N.J. May 11, 2020) (citing case by way of examples).

The Court likewise finds that Petitioner can proceed with a *Bivens* action for injunctive relief, as opposed to money damages.   As noted, the *Abassi* Court took great pains to distinguish between injunctive relief and damages, concluding that the detainees could have sought injunctive relief – even as to the detention policy claims.   *Abassi*, 137 S. Ct. at 1862.   As a result, Petitioner here may also seek injunctive relief for the alleged constitutional violations.   Because *Abassi* did not prohibit an action seeking injunctive relief, the Court need not decide whether Petitioner asserts a new *Bivens* cause of action for money damages.   Nevertheless, as to the special factors analysis, the Court notes that the Supreme Court's decision *Carlson v. Green*, 446 U.S. 14 (1980), concerning the Eighth Amendment is similar to the inquiry that the Court would have to conduct here.   Moreover, this Court has not ruled that ICE's overall, nationwide policy as to housing detainees is unconstitutional; instead, the Court has focused on particular facilities and how each has coped with the pandemic.   The Court has also considered the individual circumstances of each petitioner.

As noted, the Court is not aware of binding precedent that Section 2241 is not applicable to a civil immigration detainee alleging unconstitutional conditions of confinement.   The Court predicts that the Third Circuit will find, at minimum, that Petitioner can proceed under either Section 2241 or *Bivens* (for injunctive relief).   The Court recognizes that if the Circuit determines that Petitioner is foreclosed from seeking Section 2241 relief, it will be a major factor in determining that a *Bivens* action is viable.   *See Bistrian*, 912 F. 3d at 90 (3d Cir. 2018) (noting that in determining whether a new *Bivens* action should be recognized, two factors are "particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles"

16

(citation omitted)).   At the same time, the Court acknowledges that if a *Bivens* action is not available to Petitioner, then it may very well lead to the "necessity" of permitting a Section 2241 claim announced by the *Abassi* Court.   *Abassi*, 137 S. Ct. at 1863.

### B.  Injunction Request

Petitioner continues to submit that the conditions of his confinement violate his Fifth Amendment due process rights.   D.E. 30-3 at ¶¶ 90-108, 32-1 at 24-33.   However, the Court views Petitioner's filings, in part, as a late and improper motion for reconsideration.[10]

### C.  Motion for Reconsideration

In the District of New Jersey, motions for reconsideration can be made pursuant to Local Civil Rule 7.1(i).   The rule provides that such motions must be made within fourteen days of the entry of an order.   Plaintiff has not complied with this time requirement.   Substantively, a motion for reconsideration is viable when one of three scenarios is present:   (1) an intervening change in the controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice.   *Carmichael v. Everson*, No. 03-4787, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004) (citations omitted).   Granting a motion for reconsideration is an "extraordinary remedy," to be granted "sparingly."   *NL Indus., Inc. v. Commercial Union Ins. Co*., 935 F. Supp. 513, 516 (D.N.J. 1996) (citations omitted).

A motion for reconsideration, however, does not entitle a party to a second bite at the apple. Therefore, a motion for reconsideration is inappropriate when a party merely disagrees with a court's ruling or when a party simply wishes to re-argue its original motion.   *Sch. Specialty, Inc. v. Ferrentino*, No. 14-4507, 2015 WL 4602995, *2-3 (D.N.J. July 30, 2015); *see also Florham*

---

10 Petitioner's procedural due process claim was not raised in his previously adjudicated filings. Thus, this claim is not considered as one for reconsideration.   It is addressed separately below.

*Park Chevron, Inc. v. Chevron U.S.A.*, 680 F. Supp. 159, 162 (D.N.J. 1988).   Moreover, a motion

for reconsideration is not an opportunity to raise matters that could have been raised before the

original decision was reached.   *Bowers v. NCAA*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001).

Petitioner relies upon newly-presented evidence, such as Dr. Bloomgarden's declaration,

but he has not sufficiently shown that the evidence was not previously available.   In fact, the vast

majority of Dr. Bloomgarden's declaration relies on evidence that was previously available to

Petitioner.   In other words, Plaintiff has not demonstrated why he could not have produced Dr.

Bloomgarden's declaration along with his original TRO motion.   Similarly, Petitioner's letters of

support from family and community members could have been available to him prior to the Court's

last opinion and order; at a minimum, Petitioner has not demonstrated why he could not produce

such information with his original submissions.   Thus, with the exception limited evidence that

was only available after the Court's prior opinion and order, the Court denies the amended petition

and second motion for a TRO as an untimely motion for reconsideration.   In addition, the limited

evidence that only became available after the Court's prior opinion and order would not change

the Court's analysis.

### D.  Merits of the Claim

Even if the Court were to rule on the merits of Petitioner's case, the Court finds that

Petitioner has not established a reasonable likelihood of success on the merits.   Petitioner

continues to argue that his confinement serves no legitimate purpose.   D.E. 32-1 at 24-27.   He

submits that he lives with two health conditions that have been objectively identified as placing

him in a higher risk of suffering severe side effects of COVID-19.   Respondents take issue with

many of Petitioner's factual assertions.   For example, Respondents note that Petitioner's medical

records reflect ongoing medical care since the start of his detention.   D.E. 36 at 17-18.   They

further submit that Petitioner's new supporting exhibits, particularly Dr. Bloomgarden's declaration, does not comport with Petitioner's actual medical records.  *Id.* at 43.  Respondents note, for example, that Dr. Bloomgarden asserts that Petitioner was not notified of his having diabetes for several months until after he was tested, but the records reflect that he was notified of his lab results in less than three weeks.  *Id.* at 43-44.  Respondents further note that the declaration describes the wrong course of treatment (when compared to the actual records) after Petitioner's diabetes diagnosis.  *Id.* at 44-46.

The record continues to reflect that ECCF has been attentive to Petitioner's needs since his detention began.  *See Saquib K. v. Tsoukaris*, Civ. Action No., 20-3489, 2020 WL 2111028 at *5 (D.N.J. May 4, 2020) (denied deliberate indifference claim by a detainee living with high blood pressure, citing the facility's monitoring and control of his condition).  The Court credits Petitioner's medical records, which consist of over four-hundred pages documenting the medical care he has received since the start of his detention.  Petitioner continues to obtain medical treatment for his medical complaints, and was even taken to an off-site hospital in late June 2020 for complaints related to epigastric pain.  D.E. 37 at 329.

Additionally, the number of confirmed positive COVID-19 cases among ECCF inmates and detainees continues to decrease – with no reported cases among detainees in several weeks. This data reflects that ECCF's efforts to combat the virus have been showing positive results. Petitioner is critical of, among other things, the social distancing measures the facility has implemented, the unavailability of COVID-19 diagnostic testing, and the purported unavailability of personal hygiene products.  D.E. 32-1 at 15-16.  The Court notes all of the attorney affidavits describing ECCF conditions which Petitioner provides describe the conditions in March and early April, in other words, the first few weeks of the facility's response to the virus.  D.E. 30-12, 30-

13, 30-28.

As for Dr. Bloomgarden's declaration, among other things, it contains inconsistencies with respect to which medication Petitioner was prescribed at the start of his diabetes treatment and cites to certain health conditions or health-related events that are not mentioned in the medical records.   Moreover, the declaration is based on her experience with diabetes patients generally, rather than any conversation with, or observation of, the Petitioner in this matter.

The Court remains convinced that Petitioner's detention serves a legitimate governmental interest.   Petitioner's criminal history, which involves recent convictions for different incidents, coupled with his history of dishonesty with immigration officials and ICE officers, justify the government's interest.   Petitioner argues that he has an incentive to comply with any orders of release because he is continuing to litigate his underlying immigration case and he has the support of his family and local community.   Notwithstanding these factors, based on his record, the current conditions at ECCF are not excessive in light of the government's legitimate purpose.   The fact remains that Petitioner's criminal history includes assaulting a law enforcement officer and concealing his identity to ICE officers.   The Court's prior determination on this issue remains intact.

## III.    FIFTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM (COUNT II)

Petitioner also argues that the length of his detention, particularly in light of the unreasonable foreseeability of his completing litigating his immigration matter in the near future, has resulted in a violation of his constitutional rights.[11]   D.E. 30-3 at ¶¶ 111-128, 32-1 at 27-28. Petitioner has been in custody since August of 2019.   Petitioner was initially in ICE custody

---

[11] This claim was not raised in Petitioner's first petition.

pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii) and was ordered removed on October 21, 2019.   D.E. 36 at 16-17.   On June 1, 2020, the United States Court of Appeals for the Third Circuit granted a temporary automatic stay of removal until the Court can consider Petitioner's motion for a stay. *Id.* at 17.   Petitioner is now detained pursuant to 28 U.S.C. § 1226(c).

In 2018, the United States Supreme Court in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), held that the Ninth Circuit Court of Appeals erred by interpreting an implicit six-month limitation on detention pursuant to § 1226(c) absent a bail hearing.   The *Jennings* Court explained as follows:

> [Section] 1226 applies to aliens already present in the United States. Section 1226(a) creates a default rule for those aliens by permitting- but not requiring- the Attorney General to issue warrants for their arrest and detention pending removal proceedings.   Section 1226(a) also permits the Attorney General to release those aliens on bond, "[e]xcept as provided in [§ 1226 (c)]."   Section 1226(c) states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities.   8 U.S.C. § 1226(C)(1).   Section 1226(c) then goes on to specify that the Attorney General "may release" one of those aliens "only if the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk.   § 1226(c)(2) (emphasis added).

> [Section] 1226(c) does not on its face limit the length of the detention it authorizes.   In fact, by allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, § 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those recognized by the statute. And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope must continue "pending a decision on whether the alien is to be removed from the United States."   § 1226(a).

> . . . the Court of Appeals held [] that § 1226(c) should be interpreted to include an implicit . . . time limit on the length of mandatory detention . . . [T]hat interpretation falls far short of a plausible statutory construction.

21

In defense of th[is] statutory reading, respondents first argue that § 1226(c)'s "silence" as to the length of detention "cannot be construed to authorize prolonged mandatory detention, because Congress must use 'clearer terms' to authorize 'long-term detention.'" . . . But § 1226(c) is not "silent" as to the length of detention.  It mandates detention "pending a decision on whether the alien is to the removed from the United States," § 1226(a), and it expressly prohibits release from detention except for narrow, witness-protection purposes.  Even if courts were permitted to fashion . . . time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite. The constitutional -avoidance canon does not countenance such textual alchemy.

Indeed, we have held as much in connection with § 1226(c) itself. In *Demore v. Kim*, 537 U.S. [at 529,] we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has "a definite termination point": the conclusion of removal proceedings.  As we made clear there, that "definite determination point" – and not some arbitrary time limit devised by the courts- marks the end of the Government's detention authority under § 1226(c).

Respondents next contend that § 1226(c)'s limited authorization for release for witness-protection purposes does not imply that other forms of release are forbidden, but this argument defies the statutory text.  By expressly stating that the covered aliens may be released "only if" certain conditions are met, 8 U.S.C. § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative prohibition on releasing detained aliens under any other conditions.

. . . .

We hold that § 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings "only if" the alien is released for witness-protection purposes.

*Jennings*, 138 S. Ct. at 846-47.

Since *Jennings*, the Third Circuit issued its recent opinion in *Santos v. Warden Pike Cnty. Corr. Facility*, No. 19-2663, --- F.3d ---, 2020 WL 3722955 (3d Cir. July 7, 2020), finding that a

Section 1226(c) detainee's more than two and a half-year detention in a state prison was unreasonable and warranted an administrative bond determination hearing.   The Third Circuit's inquiry into the reasonableness of Santos's detention considered the duration of detention, the likelihood of continued detention, the reasons for the delay, and the conditions of confinement. *Santos*, 2020 WL 3722955, at *5-6.   The Circuit noted that the most important factor is the length of detention.   *Id.* at *5.   The court in *Santos* also ruled that if a petitioner is entitled to a bond hearing, the burden is on the government to show by clear and convincing evidence that continued detention is necessary.   *Id.* at *7.

Here the Court finds that Petitioner's detention has not yet become unconstitutional.   At the same time, the Court recognizes that Petitioner's detention does appear to be approaching a period in which he would be entitled to a bond hearing.   Petitioner has been in immigration detention for eleven months.   This is not an insignificant period of time, but it is also well short of the two and a half-year detention in *Santos*.   This is not to say the period time in *Santos* is dispositive, as the *Santos* court made clear that was not "setting a bright-line threshold" as to length of detention and that each case turns on a "highly-fact specific inquiry."   *Id.* at *5 (citations and internal quotation marks omitted).   Petitioner's continued detention seems likely based on his appeal of the BIA's decision and the subsequent stay of removal.   It does not appear that either party improperly, through "careless or bad-faith mishaps," contributed to any delay that may resulted in Petitioner's continued detention.   *Id.* at *6.   Finally, the Court does not consider Petitioner's conditions of confinement as a penal measure in light of the Court's analysis concerning Petitioner's substantive due process claim.   As the Court explained in its analysis of Petitioner's substantive due process condition of confinement claim, ECCF has provided consistent, ongoing medical care since the start of Petitioner's detention.   In light of the facility's

efforts to combat COVID-19 and Petitioner's ongoing access to medical care, the Court finds Petitioner's detention "meaningfully different from criminal punishment." *Id.* (internal quotation marks and citations omitted).   Similarly, Petitioner's length of detention has not yet amounted to punishment.

For the foregoing reasons, the Court denies Petitioner's procedural due process claim. The claim is denied without prejudice because it appears that Petitioner is approaching the period after which his detention will become unreasonable and warrant a bond hearing.

### IV.   MOTION TO SEAL

Also pending before the Court is Petitioner's motion to seal.   D.E. 47.   Petitioner moves the Court to seal five exhibits that consist of medical records as well as a mental health professional's affidavit.   *Id.* at ¶ 3.

A motion to seal is governed by Local Civil Rule 5.3, which provides in relevant part that a request to seal must be presented by motion.   "The motion papers must describe "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available."   L. Civ. R. 5.3(c)(2)."   *Harris v. Nielsen*, Civil Action No. 09-2982, 2010 WL 2521434 at *2-3 (D.N.J. June 15, 2010).

Petitioner's counsel, Peter J. Brody, filed a declaration in which he submits opposing counsel provided they will not oppose the instant motion.   D.E.47-2 at ¶ 5.   In light of the parties' mutual consent and the nature of the information, the Court will grant the Motion to Seal the following exhibits, identified by their docket entry numbers: D.E. 31, D.E. 37, D.E. 37-1, D.E. 42, and D.E. 43.

24

**V.      CONCLUSION**

The Court grants the motion for leave to file an amended petition and the motion to seal, D.E. 30-1, D.E. 47, denies without prejudice the Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 as well as the motion for TRO.   D.E. 30-3, D.E. 32.   Because Petitioner's habeas petition and motion for TRO, are denied, he is not entitled to fees and attorney costs pursuant to EAJA.   An appropriate Order accompanies this Opinion.

Dated: 7/29/2020

_____
JOHN MICHAEL VAZQUEZ
United States District Judge